DALE v. THE GOVERNOR.

1. The act of 15th December, 1821, conferring a military title, and settling
   an annuity for life upon Samuel Dale, for services rendered, and losses
   sustained in the Creek war, as set forth in the preamble thereto, was an
   act of ordinary legislation, and created no obligation, or contract on the
   part of the State, nor vested any interest in the annuity, until paid.
2. And even had such services and losses constituted an imperfect obliga-
   tion on the State, and had the statute of 1821 ripened it into a perfect
   one, the plaintiff would still have been bound to establish them by proof,
   before he could recover.
3. It was entirely competent for the legislature to repeal said statute of
   15th December, 1821, at any subsequent session, and the act of 31st De-
   cember, 1823, repealing the same as to the annuity, was not unconstitu-
   tional.

THIS case brought up for revision, a judgment of the
Circuit Court of the county of Monroe, rendered against
the plaintiff below, who is also plaintiff in error, at Octo-
ber term, 1828.  From the record, it appears that the first
process in the cause was a writ of *capias ad responden-
dum*, issued by the clerk of said Circuit Court against
"John Murphy, Governor of the State of Alabama," by
which he was required "to answer to the plaintiff in a plea
that he render unto him the sum of," &c. "which is due
him by the State of Alabama, and unjustly detained from

JANUARY 1831 him to his damage, &c.'' The indorsement on the writ, shews that the action "was brought to recover the amount due the plaintiff by the State of Alabama, by the provisions of an act of the legislature of the State passed 15th December, 1821, allowing the plaintiff the half pay of a colonel in the army of the United States.''

Dale
v.
The Governor.

The declaration "complains of John Murphy, Governor of the State of Alabama, who hath been summoned as Governor as aforesaid, to answer unto the plaintiff in a plea, that he render unto him the sum of &c. which is due him by the State of Alabama, and unjustly detained from him. For that, whereas, by a certain act of the general assembly of the State of Alabama, passed on the 15th day of December, in the year of our Lord, one thousand eight hundred and twenty one, it was recited and enacted,'' that 'whereas, the territory now composing the State of Alabama, was during our late contest with the British government, subjected to all the hardships and cruelties, which a relentless war, waged by the merciless savage, is calculated to produce; and whereas, our venerable citizen, Colonel Samuel Dale, was first to interpose his aid, and save its defenceless inhabitants from Indian rapine, and Indian barbarity; who during our bloody conflict with the Creek Nation, was exposed to privations, hardships and difficulties, that have impaired his constitution, and reduced him to indigence; and whereas, the said Colonel Samuel Dale, not having it in his power, from the situation of the country, to produce to the general government, sufficient vouchers to prove his services, his sufferings and his losses, by which he has failed to receive even justice from that quarter. And whereas, we the representatives of the people of the State of Alabama, feeling it a duty we owe to ourselves and our constituents, not only to remunerate him for losses actually sustained, but also to compensate him for his distinguished services. Therefore, be it enacted by the senate and house of representatives of the State of Alabama in general assembly convened, 'that the treasurer be, and he is hereby required, to pay to the said Colonel Samuel Dale, half the pay now allowed by the general government, to colonels in the army of the United States; and that he is hereby declared a brevet brigadier general in the militia of this State, and shall rank as such whenever called into the service of the State; and the governor is hereby commanded to commission him accordingly; and the treasurer is authorized and required to pay

to the said Brevet Brigadier General Samuel Dale, on the first day of January, in each and every year, the half pay as aforesaid, for and during his life, out of any money in the treasury not otherwise appropriated.'"

The declaration then alleges, that the pay of colonels in the army of the United States, is fixed by law at seventy five dollars per month, and that after the sum demanded by the declaration became due, the plaintiff demanded of the treasurer, payment of what was due him under said statute, which was refused, although there was money in the treasury sufficient to pay the plaintiff that sum. The case was tried by a jury, but upon what plea the issue was made up, the record does not shew. The jury returned a special verdict, by which they find the facts alleged in the declaration; and they further find that by an act of the general assembly of the State of Alabama, passed the 1st day of January, 1823, entitled "an act to repeal in part, an act passed the 15th December, 1821, concerning Colonel Saml. Dale," so much of said act, passed 15th December, 1821, as entitled the plaintiff to rank as brigadier general, was repealed; and that by a subsequent act of the general assembly of said State, passed the 31st day of December, 1823, entitled "an act to repeal so much of an act passed the 15th day of December, 1821, as allows Samuel Dale the half pay of a colonel in the army of the United States for life," it was enacted that so much of the aforesaid recited act, as allowed the said Samuel Dale the half pay of a colonel in the army of the United States, be thereby repealed. The jury then refer the conclusion of law upon the facts found to the Court, whether John Murphy, Governor of the State of Alabama, is indebted to the plaintiff. If the opinion of the Court be in favor of the plaintiff, they then find that the sum demanded is due to him with damages for its detention; but if the opinion of the Court is adverse to the plaintiff, they then find that John Murphy, Governor as aforesaid, is not indebted to him. On this finding, the Court rendered a judgment in favor of the defendant; and in this, it is alleged the error consists.

GORDON, for the plaintiff in error.

HUTCHISON, for the State. The action in regard to parties and process, was misconceived and not sustainable. The legislature had been required to prescribe the mode and form for suits against the State.[a] The act of 1820,

*margin notes:*
JANUARY 1831

Dale
v.
The Governor.

*a* Con. Ala. art. vi, sec 9.

JANUARY 1831

Dale
v.
The Govern-
or.

a Laws of Ala
771.

b Livingston
v. Tremper,
11 John. R.
101.

c 2 Poth. 21,
Wood v. Ed-
wards, 19
John. R. 205.
d 2 John. R.
52. 7 John.
R. 26. 10
John. R. 293.
e Pearson v.
Pearson, 7
John. R. 26.
f Noble v.
Smith, 2
John. R. 52.
g Cook v.
Husted, 12
John. R. 188.

h Frank v.
Cox, 12 John
R. 145.

gave the mode of petition to this Court, with notice to the attorney general; and gave jurisdiction to a commission of two of the judges. In the language of the constitution, this statute required the suit to be against the State, the judgment to be for or against the State, and if against the State, to be certified to the speaker of the house.[a] The act of January, 1827, requires the suit to be by summons, but against the State, the summons to be served on the governor; but the judgment to be for or against the State, and the Circuit Court is invested with jurisdiction. Here the governor has been arrested, not summoned. He was not individually, or officially liable for the demand; there should have been such liability.[b] If it had been decided against him, how should the judgment have been executed? If collected from the governor, what power or process is there to reimburse him? Had the action been proper, the proof did not sustain the declaration. It is not found that there was a sufficient surplus in the treasury, not otherwise appropriated. On that condition the annuity or pension was payable; hence the ability to perform it was an essential averment. The Court below could not judicially know the state of the finances. Proof then was plainly indispensible and not given.

I shall presently show this was a benefaction, a gift, a gratuity: assuming it as such now, acceptance on the terms of the statute should have occurred to create a vested right, the subject of an action; it does not appear either by averment or proof, that the benefaction was accepted, or the office created, consummated by commission or qualification. A promise to give must be on sufficient cause, and be accepted on the terms proposed.[c] A delivery of possession of what is given, is essential to the validity of the gift.[d] Until delivery, the promisser may revoke the promise. A promise to pay as a gift is not actionable. A note to pay money as a gift, is without consideration and nude.[e] If I promise to give you the corn growing in my field, and when ripe you enter and take it, you are a trespasser.[f] A mother promises to give to her son a slave not born, when born and until the promise is consummated it is no gift.[g] A father gave to his son his note at sixty days for $1000; this was not *donatio mortis causa*, not a gift of money delivered, but it was a promise to give, and the blood and affection were not sufficient cause to support such simple executory agreement.[h] If the statute had created vested rights; if the donation had been

consummated by acceptance and qualification, and the ac-
tion well brought, judgment on the verdict could not have
been given in favor of Dale.   On what data were the
$3042 as damages on the debt calculated?   It is quite im-
possible to conceive; and it was not legally possible either
to reform the verdict, or give judgment for that premium
out of the public pocket!

This, as a legislative grant or office, was unconstitu-
tional.   To remunerate the losses and compensate the ser-
vices of Colonel Dale, in the war with Britain and the
Creeks, the military office of brevet brigadier, and the half
pay of a colonel are given.   The legislature have given
the consideration; we may take the whole statute to find
the consideration or inducements.[a]   No exclusive sepa- [a] 1 Kent's
rate public emolument or privilege can be given, except Com. 430.
it be in consideration of public services.[b]   Was this con- [b] Con. Ala.
sideration one passed, or one to be concurrent with the art. i.
emolument or privilege to be given?   When the conven-
tion sat, what debts had Alabama territory contracted; or
what services had been rendered her, which might have
been in the mind of the convention, as proper to be saved
by the salvo of the clause, "but in consideration of public
services?"   None existed.   Is it not then likely the con-
vention were looking to the future exigencies and destinies
of the nation about to emanate?   The charter they were
framing, was to provide for the offices of governor, judges,
&c. and the compensation and privileges of these were to
be exclusive, yet in consideration of services.   All other
officers, not enumerated, but which should become need-
ful to the public, were to be in consideration of public ser-
vices; services coeval, continous and ceasing with, the
emolument and privilege of the office.   This seems to
have been the general principle pervading the whole in-
strument.   A prospective consideration being the basis of
the emolument or privilege, and that consideration of a
public nature, equivalent to the thing given, no injustice,
no evil could result.   If the wants of the State should re-
quire the creation of a debt, a perfect obligation might
arise, and the payment of the debt would not be conferring
an emolument or privilege.   It was not likely the State
would want an office without some public service or duty
attached to it, and attaching an emolument to a name, was
what had too often occurred to the prejudice of the bur-
then bearing people.

Did the convention intend to vest the legislature with

JANUARY 1831

Dale
v.
The Governor.

unlimited powers and discretion, to draw upon the public treasure, for any and every object which caprice, delusion, faction, or corruption might suggest; to call any thing a public debt or service, and tax the people to satisfy it; to carve out of the treasury, life estates for its favorites? Allow the consideration in the clause to be a passed, or even present, but not future consideration; allow it to be constitutional, because the legislature may adopt it, and what barrier can be raised against the sinecures, the satellites and pensioners of encroaching power? The histories of other nations were before the convention! If we may look to the consequences of a statute, let us look to the consequences here, as well in sanctioning this act, as in giving construction to the clause of the constitution.[a] Similar clauses in other constitutions have been held to relate to considerations not of a prospective and continuous nature, and to exclude such, as void.[b] It is insisted that this was a legislative grant, founded on a valid consideration, and that the act of 1823, repealing the grant, was void. It is conceded that if such had been its character, the subsequent law would have been void. If Dale had rendered services for the State at her request or causation; had sustained losses in that service; and the legislature had ascertained the value and amount, and directed it to be paid, this would not have been a separate exclusive emolument or privilege, nor in the least prohibited by the constitution; but a debt and contract to pay it. Subsequent legislation could not have annulled the act of recognition. This principle is consistent with the constitution, and all civil, political and natural law. Thus in *Fletcher v. Peck*,[c] it was not with Georgia to repeal the compact with Cox & Maher, after receiving the money she asked, and making the grant she promised. Nor could New Jersey,[d] pass an act destroying a privilege or right she had imparted to the Delawares, in the exchange of lands with them. Neither could the private property, acquired by the ecclesiastical corporations of Virginia for value, and under the sanction of law; nor that similarly acquired by Dartmouth College, be disturbed by revolution or legislation.[e] In *Green v. Biddle*,[f] and *People v. Platt*,[g] the grants sought to be impaired, had been on consideration paid to the grantor. In Foy's case,[h] the University had been established under the constitution, for public education; the services of that institution were to be continued for public benefit.

*a* United S. v. Fisher, 2 Cran. 390.

*b* 2 Murphy 360. 9 Cran. 43.

*c* 6 Cran. 125.

*d* 7 Cran. 164.

*e* 9 Cran. 43. 4 Wheat. R. 518.

*f* 8 Wheat. R 1.

*g* 17 John. R. 195.

*h* 1 Murphy R. 58.

But what were the services here performed? Merito-rious and chivalrous no doubt, but they were either gratuitous, or performed in the war of the United States with Britain and the Indians. To say they were for Alabama, is to do violence to the truth of our history and memory. Alabama did not exist as a state or territory; had no political existence other than as part of the United States. Taking the act as true, Dale was fighting in the war of the United States. The preamble admits he had received something from the general government, by stating he had not received what justice required. As a territory, state, or separate political society, Alabama had not caused him to serve or suffer; had not been conscious of his services and sufferings. He acted under the United States, who had the power and the means to employ, recognise, remunerate and compensate.[a] To declare war, and pay the debts of that war, and all other national debts, and to protect from invasion and violence, each part of the national domain, were powers and duties sufficient to embrace Dale's claim. To the fund provided for that purpose, Alabama, since a State, has contributed her lawful proportion. Incidental to these great powers, may be embraced a prohibition to any and each of the States; at least it remains to be settled upon principles of constitutional law, that a State may create a separate military pension list, and tax her people to support it.[b] There was then no civil or political debt due from Alabama to Dale, unless it might have been gratitude for generous valor, and sympathy for his losses. But gratitude is not a principle recognised in any civil code, as one of civil or perfect obligation.[c] If gratitude constituted a debt of perfect civil force, then not Dale alone, but all the generous brave, whose hands gleamed on the frontier, or the widows and orphans of those who fell, should have been grouped in the benefaction. This would have been too heavy a charge. Yet if the constitution may embrace past considerations, and if any thing called gratitude or sympathy, may be esteemed sufficient, the charge may be swelled in process of time, to a national debt, not foreseen by the convention or people. There must be a consideration.[d]

There being no valid consideration, the statute was a gratuity, so far as the money is separable from the office. However questionable the legislative power to give away the public fund, at least a promise to give should have been accepted on the terms proposed, and the money re-

[a] Con. U. S. art. i, sec. 8, clauses 1, 10, 11, 14, 15, art iv, sec. 4.

[b] Golden v. Prince, 3 Wash. R. 313.

[c] Cooper's Justn. 581. 1 Poth. 1.

[d] 4 John. R. 235, 296, 20, 188. 2 Kent's Com. 365.

ccived, to consummate the gift or gratuity. See the authorities above cited. A demand in 1827, is not an acceptance of a gratuity offered in 1821; but the Governor was to commission Dale as brigadier, and in that character he was to receive; neither commission nor qualification appear. This was a military appropriation, and being for the life of Dale, was void.[a] If this were an office, it was created for the public good, and subject to be abolished by the creating power, when deemed needless to sustain it. This could be done unless there were an express prohibition in the constitution.[b] It was not in the power of the legislature to confer it on any one;[c] nor could it be conferred for life.[d] By the grant, Dale may be called into service; this is in the body, not preamble of the act. Military service is expected of him during life, if needed. This too is a consideration. The pension or pay is to be given to him as brevet brigadier general. By the very terms of the grant, he is to serve and be paid as such, and not as Samuel Dale; we cannot close our eyes to this. The grant in regard to the office being void, and the pay being attached to it, both must fall.[e]

SHORTRIDGE, on same side.

BAGBY, in conclusion.

By JUDGE TAYLOR. Several points have been made by the counsel for the plaintiff in this case, but as my opinion on one of them, disposes of the case, so far as I am concerned, I shall notice only that one. It is the second in the order in which they were made, and is as follows, viz: "the act of the general assembly of 1821 was a contract, which that body had a right to create, and the act which repealed it, was unconstitutional and void."

It is of the utmost importance that we should come to a correct conclusion, as regards the nature of this act. If indeed it be a contract, there cannot be a doubt of its binding force upon the parties, although the State forms one of those parties; and that it requires the consent of both to rescind or annul it. This question has been often decided by the highest judicial tribunal in the United States, and is too evidently embraced within that provision of the federal constitution, which provides, that "no State shall pass any law, impairing the obligation of contracts," now to admit of doubt.

*Margin notes:*

JANUARY 1831

Dale
v.
The Governor.

a Con. Ala. i, 24,

b 5 Comyn 301, 223. 4 Wheat. Rep. 627, 628, 629, 630.
c Con. Ala. iv. "militia."
d Con. Ala. i, 26.

Probably it may be advantageous to examine some of the cases on this subject, decided by the Supreme Court of the United States, and compare them with the case before us, that we may ascertain what effect those decisions should have upon the determination of this case.   The first case of this kind which came before that Court, was the celebrated one of *Fletcher v. Peck.*[a]   The legislature of Georgia, by an act of the 7th of January, 1795, authorized the sale of a large tract of wild land, and a grant was made by letters patent, in pursuance of the act, to a number of individuals, under the name of the Georgia Company.   Fletcher held a deed from Peck, for a part of this land, under a title derived from the patent: by which deed Peck had covenanted, that the State of Georgia was lawfully seized when the act was passed, and had good right to sell, and that the letters patent were lawfully issued, and the title had not since been legally impaired.   The action was for breach of covenant; and the breach assigned was, that the letters patent were void, for that the legislature of Georgia, by act of the 13th of February, 1796, declared the preceeding act to be null and void, as being founded in fraud and corruption.   This directly brought before the Court, the question, whether the legislature of Georgia could constitutionally repeal the act of 1795, and rescind the sale made under it.

The Court declared that when a law was in its nature a contract, and absolute rights have vested under that contract, a repeal of the law could not divest those rights, nor annihilate or impair the title so acquired.   A grant was a contract within the meaning of the constitution.   The words of the constitution were construed to comprehend equally executory and executed contracts, for each of them contains obligations which are binding on the parties.   A grant is a contract executed, and a party is always estopped by his own grant.   A party cannot pronounce his own deed invalid, whatever cause may be assigned for its invalidity, and though that party be the legislature of the State. It was accordingly declared, that the State of Georgia, having parted from the estate of the lands, and that estate having passed into the hands of a *bona fide* purchaser, for a valuable consideration; that State was constitutionally disabled from passing any law, whereby the estate of the plaintiff could be legally impaired and rendered void.

Now in what does the similarity of the case of *Fletcher v. Peck,* to the one under consideration consist?   No

a 6 Cranch R. 87.

one ever doubted but that was the case of a contract. The State of Georgia had sold the land for a valuable consideration, and conveyed it by deed to the purchasers. The title was actually vested in the grantees, and the contract executed. But had it been only executory, it would have been equally obligatory. Had the purchasers agreed at a future day to pay, and the State, in consideration thereof, agreed to convey the lands, this would equally and manifestly have been a contract. The only questions involved in the case were, does the constitutional provision extend to contracts made by States; and has a State, being a party to a contract, a right to declare that contract void, for fraud committed by its own government, in the execution of that contract, upon the rights of those it represented.

Surely that case gives us no information in the inquiry, does the law of 1821, constitute a contract between the plaintiff and the State of Alabama? In the one case, there was a purchaser, and consideration paid; and in return for that consideration, a grant executed with all requisite formalities, vesting the title of the grantor in the grantee. But had there been no consideration paid, the grant would have estopped the State of Georgia from asserting any claims to the lands. She constituted one party, the grantees the other; and it required the concurrence of both parties, and that too before third persons became interested, to annul the grant. If the State of Alabama had sued Samuel Dale for the money which had been paid to him before the repeal of the act of 1821, then he might have insisted, that notwithstanding an act requiring him to refund, he had a vested interest in the amount he had received, of which no subsequent act of the legislature of Alabama could deprive him.

*a* 7 Cranch R. 164.  The case of the *State of New Jersey v. Wilson,*[a] is also entirely similar to that of *Fletcher v. Peck,* in its principles. There, in consideration that the Delaware Indians released to the State of New Jersey, their right to certain lands, the legislature declared by law, that other lands purchased for the Indians should not be subject to taxation. The Indians subsequently with the consent of the legislature, sold the lands thus acquired, and the legislature by subsequent enactment, imposed a tax on those lands. This was determined by the Supreme Court of the United States, to be in violation of the contract made with the Indians; the benefit of which, accompanied the title, and therefore void. Every thing contained in this case, con-

Dale
v.
The Governor.

stituted a contract. The Indians, in parting from the title
to the lands previously held by them, gave a valuable con-
sideration for those they acquired, and their exemption
from taxation. The Court certainly would not stop to
consider whether the *quid pro quo*, was of equal value
or not; the thing to be considered was, did the legislature
pass the act exempting the lands from taxation, as an ordi-
nary law, or was it a contract between the parties? It cer-
tainly possessed all the essentials of a contract between
parties, making a mutual agreement.

JANUARY 1831

Dale
v.
The Govern-
or.

Suppose the Indians had parted from nothing, and the
legislature had enacted, after reciting in the preamble, that
this nation had continued at peace, while others had waged
war against them, and that in consideration thereof, their
lands should be forever free from taxation. I ask, would
this have constituted a contract? could not a subsequent
legislature repeal this statute, and impose a tax upon those
lands? In my opinion, nothing could be plainer. The
general assembly cannot, by declaring an act perpetual,
render it so. The interest of the community, to which
that of any individual is subordinate, forbids that such a
power should be possessed by them. An act in such case,
declaring that such lands never should be taxed, would
have no more effect, than one which simply exempted
them from taxation, which might be repealed at any subse-
quent session.

The case of *Dartmouth College v. Woodward*,[a] has
also been cited by the plaintiff. In the investigation of
that case, the inhibition upon the States to impair by law,
the obligation of contracts, was elaborately discussed at
the bar, and ably considered by the Court. Dartmouth
College was incorporated by a charter from the King of
Great Britain in 1796. The legislature of New Hamp-
shire, by act of assembly, undertook to vary the charter
in essential points; to institute a number of additional vis-
itors, and in fine, to exercise a complete control over it.
Chief Justice Marshall, in delivering his opinion, says that
"the charter was a contract, to which the donors, the trus-
tees of the corporation, and the crown, were the original
parties, and it was made on a valuable consideration, for
the security and disposition of property." Nothing can
be more clear than this. Individuals associate themselves
together, and unite portions of their property, for the pur-
pose of advancing a beneficial object; that of the educa-
tion of youth, the advancement of religion, or such other

[a] 4 Wheat. R. 518.

JANUARY 1831 object as they feel most deeply interested in. They believe they can promote their views, acquire public confidence, and probably enlarge their means by being incorporated; they obtain a charter on such terms, as they believe tend to effect these purposes; can this have the effect of placing their funds and institutions in the hands and at the mercy of the legislature? Certainly not. Is it not evident that the charter was sought merely to give additional energy and efficacy to the association, and that if they had supposed it would have had a contrary effect, and vested the property they had given for the purpose, in the power of the State, to be perverted to any other purpose it might think proper, no act of incorporation would ever have been asked for or accepted? The relinquishment of all private control over the property bestowed upon the corporation, is a consideration for the charter; and there is therefore in these cases, and of course was in the instance of the charter by which Dartmouth College was incorporated, a contract which cannot be varied by either of the parties. Justice Story, in delivering his opinion in this case observes, "government cannot revoke a grant, even of its own funds, when given to a private person, or to a corporation for special purposes or uses." This is carrying the doctrine as far as any *obiter dictum* extends it, which can be found in the books; and yet it is probable this position would, were a proper case to arise, be sustained by the judicial tribunals of the country; that the first branch of it would, there can be no doubt. A grant made by government to a private citizen, could not be rescinded at pleasure, any more than a grant made by one private individual to another. After the interest had vested in either case, the subject of the grant would be beyond the power of the grantor. Yet in all the cases decided by the Supreme Court of the United States, there is not one embraced by this part of Judge Story's opinion. A valid consideration was paid in every instance, in which we find judgments of that Court invalidating a law of a State, intended to abrogate a right vested under a previous statute. In all these cases, however, we find the Court iterating and reiterating the declaration, that it is a matter of the utmost delicacy to examine into the constitutionality of a statute, passed either by the federal, or a State legislature; and that whenever it is at all doubtful, whether the statute be a violation of the constitution, it is the duty of the Court to enforce it.

Dale
v.
The Governor.

I come then to examine the statute on which the suit in this case is founded, that we may ascertain whether it comes within the description of a contract given in any of the cases which have been cited; whether the statute of 1821 in favor of the plaintiff, was a contract vesting in him a present interest in the amount to be paid him under it during life, or whether it was an ordinary act of legislation, liable to be repealed at any future time. It must be borne in mind, that all the decisions to which I have referred, expressly turn upon a provision of the constitution of the United States. Let that provision be repealed, and full effect would be given to all those statutes. The legislature, where not restricted by constitutional law, can with impunity violate all its contracts; and although the judiciary might view their proceedings as unjust, and feel every wish to rescind them, it would be compelled to enforce the statute. There must, therefore, of necessity be a difference observed in the construction of the acts of individuals, and of a legislative body. The interests of society require that the law making power should only be confined within the plain boundaries of the constitution. It would indeed be impolitic, if policy alone were consulted, for the Courts to declare every act passed by different legislatures, providing for the annual payments of sums of money in future years to individuals or corporations, without consideration, to be irrevocable. Great injury might result from such a course of decision. Men favorable to a particular course of policy, by accidentally forming a majority in one legislature, might entail upon the country, inconceivable evils, or secure a course of policy directly adverse to the opinions and wishes of a large majority of the community, and of all subsequent legislatures.

It is urged upon us that the statutue of 1821, in favor of the plaintiff, was passed for a valuable consideration; that this consideration is admitted in the preamble, which amounts to clear proof of the fact; being an admission of the party interested; that although the consideration was a past one, yet it constituted such an imperfect obligation on the State, as to make a subsequent promise to pay, binding. The title of the act, is "an act expressing the gratitude of the State of Alabama for the services rendered by Samuel Dale to this State." So far as the title can aid us in ascertaining the object of the general assembly, that object was not to make a grant to, or enter into a contract

JANUARY 1831 with the plaintiff, for a valuable consideration; but to make a donation, for the purpose of evincing their gratitude to him. It is not necessary to enter into a labored discussion, to prove that a promise arising from gratitude, is not binding; that has been admitted in the argument. But it is insisted that the preamble contains an acknowledgment of a valuable consideration, and that when the terms of a statute are plain, the title can never be resorted to for the purpose of varying the evident meaning of the statute. It is true, that not only his personal exertions and hazzards are adverted to in the preamble, but it is also stated that he was reduced to indigence, by his exertions in the war against the Creek Nation of Indians. But I would ask, are these admissions made in a way to satisfy the reader, that the legislature had proof of the facts set forth in the preamble? So far from it, that it appears to me no person can read this preamble, and believe there was any such proof. It contains internal evidence that it was an effusion of that gratitude which is spoken of in the title. That the amount and value of Colonel Dale's sufferings and losses, formed no part of the inquiry; but the act was passed with the view of making him comfortable in life, from a feeling of gratitude alone. The preamble itself declares that the plaintiff was unable to produce to the general government, vouchers to prove his services, his sufferings and his losses; how then could he produce such vouchers to the State government? It is obvious that he could not, and did not do so; that in passing the law, there was no inquiry made into the extent of those services, sufferings and losses; but that the legislature intended to make a donation to the plaintiff, without considering any moral obligation which he held upon them, and only to reward him for his faithfulness and devotion to the country. If it were admitted that a previous imperfect obligation, would make a subsequent promise, founded thereon, binding upon the State; in this instance, there is no proof that such imperfect obligation existed. This preamble does not furnish it. It is drawn with great latitude, and evidently more with the intention of eulogising the plaintiff, than of giving a plain unvarnished statement of his claims upon the country. The preamble, like the title, as a common rule, forms no part of the statute, and can only be resorted to in aid of the construction of a statute, when the statute itself is doubtful and ambiguous; and the reason given for this is, that they are gen-

*Dale*
*v.*
*The Governor.*

erally very loosely and carelessly inserted, and are not safe expositors of the law. They may serve to shew the general scope and purport of the act, and the inducements which led to its enactment.[a] The provisions of the act itself in this instance, are plain and perspicuous, and do not render a resort to the title and preamble necessary; but resort to the preamble is had, to shew the inducements to the act, and that they were such as render it obligatory upon the State as a contract. If the preamble has a tendency to prove this, the title which can be resorted to equally with the preamble, proves directly the contrary. The latter declares that it was an expression of the gratitude of the State, and the words of the former go far to prove this to have been the sole intention of the act, for its language is that of the highest eulogy, and nothing more.

But if an imperfect obligation could be ripened into a perfect one, by the promise of a sovereign State, still under our constitution, the judgment in this case must be against the plaintiff. It will be admitted that where an individual is sued on a promise, the consideration of which is a previous imperfect obligation, not only the promise, but that previous imperfect obligation must be proved. This rule certainly extends also to a State. It might probably be replied, that the declarations of the individual, by which he acknowledged that obligation, would be sufficient. This is conceded; but high wrought encomiums, and professions of gratitude would not be sufficient. It may be well doubted, however, whether the most explicit acknowledgment by the general assembly, that the services and losses of the plaintiff had been proved to their satisfaction, would have been sufficient. The first section of the declaration of rights, declares that "no man or set of men, are entitled to exclusive, separate public emoluments or privileges, but in consideration of public services." The legislature has no right then to grant exclusive emoluments, but in consideration of public services. Can the legislature, by an acknowledgment of public services, dispense with the necessity of their proof, when a Court of law is resorted to for the purpose of recovering "emoluments" which they have bestowed? If this can be done, the constitution may be violated with impunity. I am of opinion, under this section, that the plaintiff would have been bound to prove his losses and services, before he could have recovered, even had they constituted an imperfect obligation, and had the statute of 1821, ripened it into a perfect one.

51

I cannot however admit, that the doctrine of moral or imperfect obligations, can be applied to a sovereign State. There is much difficulty in drawing the line of distinction, between that which does, and that which does not constitute such obligation, as respects individuals, and it would be impolitic in the extreme, to extend it to the State and federal governments of this union. It would have a great tendency to prevent the reward of merit, and to destroy that stimulus to extraordinary exertion, which the hope of this reward secures; because such reward is generally bestowed in annuities, and if the statutes bestowing such annuities formed contracts, it would behoove the legislatures to be careful indeed how they enacted them. It is most certain that the statute of 1821, in favor of the plaintiff, would have been as obligatory without the preamble as with it. If he has performed services, or expended a dollar more than the law imperiously required of him, in aid of the operations, or in protection of the citizens of the country, proof of the facts, and that the act was induced by that circumstance, would have the same effect with the recital in the preamble, in giving him a vested right in the annuity. To what conclusion would this lead? Inevitably to this, that all pension laws are contracts, and can never be repealed. This is a doctrine which I believe has never been contended for; yet pensions are always given in consideration of real and supposed services to the public, or losses sustained in the cause of the country. The soldier who has lost a limb in his country's cause, has as strong a claim as any other on its bounty, yet the claim is only on its bounty; and if a statute were passed recognising that claim, and in consideration thereof, settling upon him, a pension to be paid annually, during life, this act would partake as much of the nature of a contract, as the statute on which this suit is founded; yet surely such a law might be repealed by the legislature at its next session.

The result of my investigations then is, that the plaintiff had no vested interest in the annuity, until it was paid to him; that the statute of 1821, was an act of ordinary legislation, which it was entirely competent for the body who enacted it, to repeal at a subsequent session; and that the repealing act was not unconstitutional.

I have purposely omitted the questions raised by the defendant's counsel, with regard to the constitutionality of the act of 1821; and that of the imperfect obligation in

favor of the plaintiff, resting, if any where, on the federal government. Under my view of the case, it was unnecessary to consider these points.

Upon reading the act of 1821, it seems to me the idea must strike every mind, that the general assembly intended to settle a pension on the plaintiff; the amount not to be governed by any losses of property he had sustained by his devotion to the country, or by the real value of his personal services; but simply regulated by that feeling of gratitude which is expressed in the title. To estimate in money, the services of a citizen, who in the time of need, braves every danger, and breasts every enemy of his country, would be impossible. Yet the citizen owes all this to the land in which he lives. We admire the hero who has nobly opposed the invading foe, and almost single handed, and to the jeopardy of his life, repelled them, while others sought safety in flight; yet he has but done his duty; and should an annuity be settled upon him in consideration of such services, it is done not by way of contract: not to give an equivalent in dollars and cents, but to express a country's gratitude. I should be among the last to arrest the little streamlet which issued from the act in favor of the plaintiff; but I cannot decide that the power which started, is not competent to stop the current. It is my opinion that the judgment should be affirmed, and of this opinion is a majority of the Court.

By LIPSCOMB, Chief Justice. The only question it seems to me that can be raised in this case is, whether a contract has been made between the State of Alabama and the plaintiff, by which he has acquired a vested right to the amount of money directed to be paid to him by the act of 1821. If such a contract was enacted by that act, I have too much respect for the Court of which I am a member, to waste time in urging any argument in favor of the position, that it is not only our right, but our duty, and one that cannot be evaded, to declare any subsequent act of the legislature, abrogating the contract, wholly void. This doctrine is now too well settled to admit of a controversy. We will proceed then to inquire into the rights acquired by the plaintiff under the act of 1821. And the most favorable view that can be taken of it for the plaintiff is, to construe it in the same way that we should a contract between two individuals. The great object in the construction of every instrument of writing, claimed to

Dale
v.
The Govern-
or.

be the evidence of a contract, is to seek out the intention of the parties to it; that intention, when it is ascertained, must prevail. It is permitted not only to resort to the preamble, but to the title of a statute, for the purpose of determining its true intent and meaning. The title is, "an act expressing the gratitude of the State of Alabama, for the services rendered by Samuel Dale." The preamble is as follows: "whereas, the territory now composing the State of Alabama, was during our late contest with the British government, subjected to all the hardships and cruelties, which a relentless war, waged by the merciless savage, is calculated to produce; and whereas, our venerable citizen, Colonel Samuel Dale, was first to interpose his aid and save its defenceless inhabitants from Indian rapine, and Indian barbarity; who during our bloody conflict with the Creek Nation, exposed himself to privations, hardships and difficulties, that have impaired his constitution, and reduced him to indigence; and whereas, the said Colonel Samuel Dale, not having it in his power, from the situation of the country, to produce to the general government, sufficient vouchers to prove his services, his sufferings and his losses, by which he has failed to receive even justice from that quarter. And whereas, we the representatives of the people of the State of Alabama, feeling it a duty we owe to ourselves and our constituents, not only to remunerate him for losses actually sustained, but also to compensate him for his distinguished services." The act then proceeds to require the treasurer to pay to him the half pay of a colonel in the United States' army; the governor is required to commission him a brevet brigadier general; it provides that his pay shall be annual, on the first day of January, in each and every year, as long as he may live.

If the preamble, the title, and the enacting clause were taken altogether, a different meaning would not be conveyed from that clearly pointed out by the title, or by the preamble taken separately. Take the parts then altogether, or separately; so far from expressing any thing like a contract between the State and the plaintiff, it is clear that the terms used, repudiate the slightest presumption, that it was ever intended to be so construed. The only sense in which the statute was ever intended to be understood, is I think obvious; it was intended as a strong expression of gratitude and admiration for the character and chivalrous feats of the plaintiff. It wanted an essential

ingredient to a contract at the time, and contains no pro-
visions by which it could aftewards become such.   Colo-
nel Dale was not a party to it.   He only appears as the
subject acted on by the legislature, but has no agency as a
party.   It makes a distinction between what it does for
the benefit of the plaintiff, and what in justice could be
required, and clearly holds out the terms and the consider-
ation on which the legislature acted; that it was a free will
offering of gratitude awarded; that they were not bound
*ex debito justiciæ* to the plaintiff.  The preamble declares
that not even justice was rendered him by the general go-
vernment, and by that declaration it is clearly shewn, that
they felt the appeal as one to their generosity, and not de-
pending on the justice of the case.   A sense of the duty
that the Representatives owed to themselves and their
constituents, impelled them to this act of generosity; but
they in no part of the act, acknowledge any obligation,
either perfect or imperfect, to pay Colonel Dale as a cred-
itor of the State.   It is very clearly shewn, that the legis-
lature considered the plaintiff as a *bona fide* creditor of
the general government, and this shews conclusively that
the State was under no moral obligation to pay the debt;
nor was it intended that the State of Alabama, by assum-
ing a debt due from the general government to the plain-
tiff, became either a debtor to the one, or a creditor of the
other.   And if as is frequently the case, Colonel Dale
should procure evidence, that he had supposed was lost,
by which his claims on his government would be amply
sustained, it would not be prejudiced by payments made
to him under the act of 1821.   The general government
could not say to him that Alabama, in the abundance of
her gratitude, had assumed that debt, and that he must
look to that quarter for his pay.   If ten times the amount
had been voluntarily paid by the State as a free gift, it
would afford the general government no grounds for resist-
ing payment.   Colonel Dale might reply to such defence,
"I appealed to the generosity of Alabama, but I now rely
on law and justice, in asking payment at your hands."

Had the legislature entertained the slightest idea, that
they were directing a moneyed demand against the State,
to be paid without requiring the customary vouchers, other
terms would have been employed more expressive of the
character of debtor and creditor, than those used in the
"act, expressing the gratitude of the State of Alabama."
They intended nothing more than what is so concisely ex-

pressed in the title of the act, and never intended to acknowledge that the State lay under an imperfect obligation, to pay for all the services rendered, and losses sustained by individuals in any part of the territory, now embraced in the State of Alabama, during the war between Great Britain and the United States. At the period referred to by the act of the legislature of 1821, the scene of Colonel Dale's gallantry and achievements, composed a part of the Mississippi territory of the United States, and the inhabitants exercised and enjoyed no rights nor privileges, but such as were especially granted by Congress; they enjoyed not the rank and power of an independent State; sovereignty to them was unknown; they were in a wild state of vassalage to the government of the United States, and as such had no voice in peace or in war; they were not parties to the war, and were only known in it as subjects of the federal government at Washington. Hence they were not in a situation to receive, or confer an obligation. What was done for them individually in the way of protection, was conferring an obligation on the parent government, and what was done by them in support of the war, was done in behalf of the same power. If the inhabitants of that territory had been members of an independent community, and services had been rendered, and protection afforded, and losses sustained in so doing, according to acknowledged principles of government, a good ground would exist to support a claim for compensation and remuneration; and this obligation would pursue the government through all its changes. But in the situation of the then inhabitants of the Mississippi territory, they were neither bound by the acknowledged laws of nations, nor by the rule of morality, to make such compensation or immunity. The services if rendered, and of which there can be no doubt, constitute a good claim against the United States, but none against those who afterwards occupied the same country, under a different form of government. In the science of jurisprudence as well as every thing else, principle will often elude our grasp, unless it can be embodied and rendered tangible, by presenting it not in the abstract, but in its effects on a particular case; it may then be profitable to refer to a few cases illustrative of the influence of the principles I have endeavored to support.

It has been said, and said truly, that governments are bound to afford protection to their members, and to remu-

nerate individual losses, sustained for the public welfare.
In the progress of the war so often referred to, immense
losses were sustained of property and life, at Fort Mims.
By the rule laid down, which should be looked to for re-
muneration, the State of Alabama or the United States? if
to the latter, the rule is not violated, but fully sustained,
and ample justice is done; if to the former, you hold new
parties liable, and liable too for consequences that they
had no participation nor agency in bringing about.    Most
of the territories of the United States during the war, be-
came in their time the scene of military operations, and
every man capable of bearing arms, was under the imme-
diate orders of the war department, to fight when and
where he should be directed, however remote it might be
from his own family and habitation.    And in each of those
territories, immense losses of private property were sus-
tained; the inhabitants had no local sovereignty to pro-
tect them as it has been seen; would it be consistent then,
with the rules of morality, that they should afterward be
taxed to raise a fund out of which remuneration is to be
made for losses, and compensation for services; the an-
swer is a clear one, that the United States are alone respon-
sible.

It seems to me then very clear, that even if the legisla-
ture had designed that the act of 1821 should be consid-
ered as a grant or contract, that there would be no suffi-
cient consideration, either of perfect or imperfect obliga-
tion to sustain it, and it could be revoked at any time be-
fore consummation.    The consummation of the promise
on the part of the State, was the payment of the money;
the revocation cannot affect the payment that had already
been made; it could only act prospectively on what re-
mained to be paid.    The act as I have before said, was a
mere free gift, induced by an impulse of noble and gen-
erous feeling, similar in its character to the one that pro-
duced the act of Congress, granting a township of land to
General La Fayette; the gift in the last case was perfect
and absolute in all its parts, and was therefore placed be-
yond the power of revocation.    But if Congress, instead
of this perfect and absolute gift, had only provided that at
some future day, a certain quantity of land should be ap-
propriated, or a certain subsidy of money should be paid
as a more solid expression of national gratitude, than the
hosanas of praise, that every where greeted the nation's
guest, who would have doubted the authority of that body

to revoke the gift at any time before it had been executed; and it is in the range of possibility that it would have been the duty of Congress to have made the revocation. Suppose that the gift had been made as I have put the case, and aftewards, and before its consummation, this great apostle of liberty and friend of mankind, had occupied the attitude of a public enemy of the country? the tide of national events, without loss of principle or honor, might have made it such; could Congress in such an event, hesitate to revoke the grant? I have put this case to illustrate the position, that the rights of Colonel Dale were divisible; that the gift of the whole was not made absolute and executed by the payment of the first, or any number of annuities; that it was executory as to all that had not fallen due, and not being supported by a valuable consideration, could be revoked. That an act of the legislature may in many cases, have the force and effect of a contaact, is not questioned. In the case of a private corporation, where certain privileges are to be enjoyed by the corporation, in consideration of a supposed public benefit resulting from the corporation, the act of incorporation would be a contract. The State would be one party, and the members of the corporation in their corporate capacity, would be the other party to the contract. The case of *Woowdard v. Dartmouth College,* was of this description, where the inviolability of the charter was sustained by the Supreme Court of the United States. The State may, by an act of the legislature, sell its domain, and the contract be complete in all its parts, having parties and consideration to support it; such was the case of *Fletcher v. Peck;* the contest grew out of a sale made by the legislature of Georgia, of a large tract of land known as the Yazoo purchase; a valuable consideration had been paid to the State for the purchase; at a subsequent session of the legislature, an act was passed annulling the contract, on the ground that the act of the previous session making the contract was fraudulent. The Supreme Court sustained the contract, and declared the act rescinding it void. There were many other cases referred to by counsel in the argument of this case, supposed to sustain in principle, the plaintiff's right; but with due deference, it does not appear to me that any of them bear the slightest similitude to the act of our legislature, on which he relies. In all of them a contract was clearly made out, and not a case has been found, where a mere gratuity by the legislature has been holden to be a contract,

not to be revoked by the power that granted it. I am therefore of opinion, that the act of the assembly relied on by the plaintiff, is not a contract, and that it was competent for the legislature to repeal it.

By JUDGE COLLIER. In an inquiry into the design and intention which induced the passage of the act of December, 1821, we are saved the labor of calling in aid, the rules of construction which judicial decisions have established for the exposition of legislative enactments. The preamble to the act contains a declaration so brief, pointed and perspicuous, as to leave no room for their operation. It declares the intention of the legislature not only to remunerate the plaintiff for losses actually sustained, "but also to compensate him for his distinguished services." The principles which mark the moral duty of man, associated by governmental ties, not only approve, but commend the purposes of the legislature. The inducement to the social compact, was the common defence and advantage of its members, and the obligation reciprocally incurred, by each and all, is commensurate with the object which dictated their union. When therefore the public exigency demands the services or the property of the individual, he has no right to refuse obedience to the demand; for the interest of all is paramount to the interest of each. And such may be the pressure of the emergency, that no time is allowed to stipulate with the citizen; under such circumstances, the government appropriates private property to public purposes. In treating upon this subject, Vattel remarks, that "in the act of associating, in virtue of which, a multitude of men form together a state or nation, each individual has entered into an engagement with all, to procure the common welfare; and all have entered into an engagement with each individual, to facilitate for him the means of supplying his necessities, and to protect and defend him. The entire nation is then obliged to maintain that association; and as in its duration, the preservation of the nation consists, it follows from thence, that every nation is obliged to perform the duty of self-preservation."[a] Again, says the learned author, "if a nation is obliged to preserve itself, it is no less obliged carefully to preserve all its members. The nation owes this to itself; since the loss of even one of its members weakens it, and is injurious to its own preservation. It owes this also to the members in particular, in consequence of the

a Vat. Law of Nations 20.

52

very act of association; for those who compose the nation, are united for their defence and common advantage. Since then a nation is obliged to preserve itself, it has a right to every thing necessary for its preservation. For the law of nations *gives us a right to every thing, without which we could not fulfil our obligations;* otherwise, it would oblige us to do impossibilities, or rather would contradict itself in prescribing a duty, and prohibiting at the same time the only means of fulfilling it.''[a] These quotations speak with much clearness of diction, the nature of the social alliance, and most strikingly shew, that as the physical strength of a nation depends on the number of its members, and as the primary design of union was their mutual interest and advancement; so a nation which is but an aggregate of its parts, is bound to protect its components; and being obliged to their protection, it results *ex necessitate,* that it has the right to employ the means necessary to effect that end. It may be assumed as a right, proveable by deductions drawn from the character of the social compact, that individual services and private property, may be put in requisition by the public, either to preserve the government or protect its members.

This train of reasoning, when practically applied, conduces to prove that it was competent for the territorial government of Mississippi, to have employed the services of the plaintiff, and have expended his property in the protection of her territory against invasion, or its inhabitants from the insult and aggression of a menacing foe. Yet the government had no right to put in requisition for these purposes, the personal services, or the property of the plaintiff, without making a just compensation for each. The end of the social connexion being the common benefit of each, no citizen can be required to contribute more than his proportion for its attainment. On this point Vattel asks, ''is a state to make good to private persons the damages sustained in war?'' and he answers the question thus: ''we may see in Grotius, that authors are divided; here two kinds of damages are to be distinguished; those done by the state or sovereign, and those done by the enemy. Of the first kind, some are done voluntarily and by precaution, as when a field, a house, or garden, belonging to a private person, is made use of for building the rampart of a town, or some other piece of fortification, &c. such damages are to be made good to the owner, who should bear only his quota; but other damages are caused

JANUARY 1831

Dale
v.
The Governor.

a Vat. 21 & 22

by inevitable necessity; as for instance, the havoc done by
the artillery in retaking a town from the enemy. These
are accidents; they are calamities, arising from fortune.
The sovereign, if the state of his affairs permit, is to shew
an equitable regard for the sufferer, but no action lies
against the State for misfortunes of this nature, for losses
which it has not occasioned willingly, but through neces-
sity and fortuitously, and in the exercise of its rights."
Both the federal and state constitutions, maintain the in-
violability of private property, by declaring that when-
ever it shall be taken for public purposes, retribution shall
be made to its owner.

In the scale of moral justice, it is difficult to distinguish
between the force of the obligation to make compensation,
where an individual voluntarily expends his fortune for
the benefit of his country; and where that country, by the
strong arm of power, wrests it from him. If there be a
difference, it has eluded my reflections, and I leave it for
the casuist to determine. If one man rescues from loss,
the property of another, and in doing so, sustains an inju-
ry, surely the behests of duty require that the other should
make compensation; and the right to demand it is consid-
ered by the civil law as a *quasi* contract, and the obliga-
tion to make remuneration as perfect.*a* The municipal *a* 1 Poth. 62.
law of this country, by which the rights of *meum* and
*tuum* are ascertained, does not recognize the *quasi* con-
tract of the civil law, as imposing a perfect obligation, but
only a moral duty. And so considered, it is declared to
be a sufficient consideration to sustain a promise for the
discharge of that duty.*b* So natural law requires him who *b* Scott v. Nel-
receives a benefit, to make for it a requital, unless it be son, Esp. N.
P. Dig. 95.
designed as a gratuity; it is a maxim of that law, that *nemo* Watson v.
*ex alterius detrimento fieri debet lucupletior.* With- Turner, Bull
out affecting the result, it may be conceded, that the plain- N. P. 147.
Chit. on Con
tiff had not a perfect right to demand remuneration for 10, 11, 13.
his services, and compensation for his losses, until provis- John. R. 259.
3 Pick. R.
ion was made by the act of December, 1821; yet I appre- 207. 2 Bingh.
hend that the government, from the time the services were R. 437.
rendered, and the losses sustained, became under a moral
obligation to requite the plaintiff, and that, that act only
made perfect the obligation in law, which was before bind-
ing in morals.

It has been argued for the defendant, that the obligation
on the part of Alabama to requite the plaintiff is imperfect,
and that the only retribution he can claim, is public grati-

tude; and if he is entitled to compensation in a commodity of greater value, it should be rendered by the federal, and not the local government.    Without instituting an inquiry upon the point, it has been already conceded, that the plaintiff's right to remuneration, upon principles of municipal law, was not perfect; and the view which I take of the case, relieves me from considering this question upon principles of national law.    Had the plaintiff's right been perfect, the statute of 1821, was an act of supererogation, except so far as it made an appropriation for the plaintiff's benefit, or awarded a compensation beyond the value of his services and losses; for the tribunals of justice are ever adequate to the enforcement of such rights.    This argument it is apprehended has been generated by an adoption of Pothier's general division of obligations, and the examples illustrative of each, as exclusive of all others, and entirely loses sight of obligations, founded alone upon moral duty; which though they cannot be coerced by the power of the laws, they constitute, as already shewn, a sufficient consideration for promises predicated upon them. "There are many debts," says Vattel, "sacred to him who knows his duty; though no action can be brought against him.*    It may be true that the federal government should remunerate the plaintiff, but does it follow necessarily that no obligation to do this rests elsewhere.    If the territory of Mississippi was concerned in the preservation of the lives and fortunes of its members, and one of its citizens contributed more than his quota of property, in endeavoring to effect that object, do not the dictates of duty require that he should be compensated?    And by what system of ethics could the local government of Mississippi have disavowed the obligation to award compensation? These questions suggest a ready and an appropriate answer.    There can be no doubt, that if the federal government had remunerated the plaintiff, he would have had no moral right to ask the local government for its munificence.    There is no incongruity in the idea of two persons being under a moral obligation, without contract, to a third; and though as between themselves, the obligation may be stronger upon the one than the other, yet the third may have an equal claim upon them.    Now if the individual on whom the obligation is most powerful, were to fail in its discharge, he on whom it is weaker, cannot avail himself of such failure, in justification of an omission by himself.    The obligation then of the local government, if

*a* Page 596.

it ever existed, must continue until it is discharged, either by that or the federal government. If the plaintiff rendered the services which the preamble to the act recites, the government of Mississippi has derived from them a political benefit. That territory could not be admitted a member of the federal family, until it acquired the amount of population which the laws of Congress require. The period for its admission would surely arrive sooner, if the lives of its citizens were preserved, than if they had fallen victims to "Indian barbarity." It is however quite probable that the admission of Mississippi or of Alabama, was not accelerated by the services of the plaintiff; yet as this is only a probability, and as the preamble leaves uncertain the extent of his services, I am disinclined to say that the plaintiff's services, in a political point of view, were entirely valueless. If they were of any value, no matter how inconsiderable, then is there a sufficient consideration to sustain the grant: for the question is not whether the consideration bears a just proportion to the compensation made, but is there any consideration.

Having shewn that the act of December, 1821, so far as it proposes to compensate with money, the services and losses of the plaintiff, is sustained by the consideration of moral duty, imposed upon the territorial government of Mississippi, it may be well to inquire, whether in that point of view, the act is inhibited by constitutional principle. By the first section of the declaration of rights, it is declared, "that all freemen, when they form a social compact, are equal in rights; and that no man or set of men, are entitled to exclusive separate public emoluments or privileges, but in consideration of public services." This declaration is restrictive of the right of the legislature, to confer exclusive privileges upon the citizen; but leaves that body free to remunerate public services, and indemnify losses incurred for the common advantage. Legislative action is not so much trammelled, as to forbid an appropriation of money for any other purpose than the discharge of the perfect obligations of the State. States are but an association of individuals for political purposes, and have moral duties to perform, which of course impose moral obligations for their performance. It could never have been the design of any people, cherishing a just system of ethics, to prevent the discharge of these, by the inhibition of fundamental law. In fact, the right to remunerate for public services, is expressly acknowledged,

and the right to compensate for losses, is neither impliedly or expressly taken away; it is one thing to grant emolument, but quite a different thing to reimburse an individual his expenditures for the public interest; the one implies profit or advantage, the other the payment of that which may be claimed *ex debito justitiæ.*

If the dictates of moral justice should have impelled the local government of Mississippi, to compensate the plaintiff for his sacrifices, sustained in the protection of her citizens, is not the obligation to do this, equally imperative upon Alabama? Her jurisdiction and sovereignty, by a change of government and geographic limits, now prevail over the portion of that territory where his services were rendered and his losses sustained. The right of a people to change their form of government, is a principle acknowledged as well by the law of nature as of nations, and is founded upon the duty of mankind, to provide for their security and happiness; but a change can have no influence, either upon the rights of individuals, or of nations, unless the continuance of these rights are incompatible with the new government. With regard to the public debts, as they were contracted by the consent of the creditor, so only can they be discharged, either by payment or the release of the debtor. This release must come from the creditor. In inquiring into the force of national engagements, we must distinguish between power and right, as abstractly considered; questions of the first description are not examinable by the judiciary; those of the second, form fit topics for their examination. Again, the moral obligations of states, like those of individuals, are in their nature permanent and continuing; and derive not their force from the vacillating opinions of man; they do not change with the tide of events; what to day was considered sufficient to impose a moral duty, was so considered yesterday, and will be to morrow; hence a State cannot be absolved from its performance by a change of its political condition.

The provision of the declaration of rights, which I am examining, does not seem to limit the legislature in conferring emoluments and privileges, for services which were rendered after its adoption. The language is general, and leaves the legislature free to compensate all public services, without regard to the period of their performance: as therefore an extended construction is most promotive of justice, and does not oppose the object which the framers

of the constitution had in view, I am inclined to give to this provision its full scope and operation. The act of December, 1821 then, so far as it proposes to make to the plaintiff a pecuniary compensation for his services and losses, is not repugnant to constitutional restriction. We will now test by the same standard, the validity of so much of that act, as directs the plaintiff to be commissioned as a brevet brigadier general in the militia of this State. The fourth section of the article of the constitution, in regard to the militia, directs that "all officers of the militia shall be elected or appointed in such manner as may be prescribed by law; provided, that the general assembly shall not make any such elections or appointments, other than those of adjutants general, and quarter masters general." This provision is a clear inhibition of power in the legislature to appoint militia officers, other than those expressly excepted; and its wisdom is obvious. If appointments were made in any other manner than by election by the militia themselves, there would be likely to exist a want of confidence in the officers, which is essential to give strength and stability to an army, and to keep alive a proper subordination and discipline between the commanders and the commanded. Without employing further illustration upon this topic of inquiry, I will only remark that the statute and the constitution, in the parts we are considering, are so conflictive with each other, that they cannot both stand together.

It has been argued for the defendant, that the statute cannot be invalidated in part, and operative for the residue; that, that part of the act which is opposed to the constitution, will so taint and corrupt the entire enactment, as to render it void in toto. This argument merits an examination: The act contains either two separate and independent provisions, the first requiring that the plaintiff shall be paid the half pay of a colonel in the army of the United States; the second conferring the rank of brevet brigadier general in the militia of this State; or else the latter provision is to be considered as a condition annexed to the first, and in either point of view, the result will be the same. Legislative grants, like the deeds of individuals, should be construed most strongly against the grantor, and most favorably for the grantee. Such an exposition must be given, if practicable, as will make every part operative and efficient, *ut res magis valeat quam pereat.* If the validity of all its parts cannot be maintained

JANUARY 1831

Dale
v.
The Govern-
or.
as reconcileable with the paramount law of the constitution, those parts which are not prohibited must stand; if a contrary rule were to prevail, then indeed would the judiciary be justly chargeable with placing itself above the legislative power. Courts of justice are bound to give effect to statutes which do not oppose the constitution, and they have not the moral power to refuse effect to them entirely, because in some of their parts, they are objectionable; but it is their duty to scan them, and to distinguish between the parts which are valid and those which are invalid. Vide the *Bank of Hamilton v. Dudley's heirs*.[a]

*a* 2 Peters' R. 524.

If a contract be made between individuals, by which one of the parties obliges himself to do several things, some of which are against, and others consistent with law, the contract shall be good to the extent of its legal stipulations.[b] But if the things against law are inhibited by statute, the contract shall not prevail, even so far as it is legal.[c] From these legal rules, is deduced the argument I am examining. The analogy between legislative grants and individual contracts, is not in every respect discernable. The one is an act of legislation, with such provisions as the law-making power may think proper to insert, to which the grantee has not by his immediate agency contributed; the other is the act of both the contracting parties, with such stipulations as they may agree upon; without the consent of each, it is not consummated. In the one case, it would be unjust to permit the grantor who alone had dictated the terms of the grant to avoid it, because he had granted more than he was authorized; while in the other case, as both parties were alike concerned in prescribing the terms of the contract, it would be entirely just, and perhaps public policy would require that it should be void in toto, because in some of its parts, it was opposed by positive law. But if this view be founded in error, and the analogy between legislative grants and individual contracts is just, I think it may be demonstrated, that the acceptance of a military commission and a liability to serve the State, in that character, is but a condition annexed to the grant of compensation for services and losses; the latter is the principal, the former the incident. Nor is it a condition precedent, for no particular period of time is fixed for its performance, and in its nature, it cannot be precedent; but it must be held as a condition running with the pecuniary grant, for which a time of payment is ascer-

*b* Co. Lit. N. 1 page 206.

*c* 8 John. R. 253.

tained. Conditions, the performance of which are not essential to the vesting of an estate, but on which its continuance depends, are called conditions subsequent, and are not objects of favor in law, because they tend to destroy estates. If a condition be impossible to be performed, or is against law, the right, or estate to which it is annexed, having once vested, is not thereby divested; but becomes absolute and unconditional.[a]  The condition then which required the acceptance of a military commission, being prohibited by the constitution, is void; and the right to the pecuniary grant having vested, is absolute and unconditional.

JANUARY 1831

Dale
v.
The Governor.

a  4 Kent's
Com. 125.

It is inferable from what has been already said, that so much of the act of the 1st January, 1823, as declares that the plaintiff shall not rank as brevet brigadier general, by virtue of the act of December, 1821, is not opposed to the constitution, but is rather nugatory, because that act was not *pro tanto* constitutional. Whether the act of January, 1823, is unconstitutional, so far as it declares that that act shall be so construed as to prevent the plaintiff from receiving an allowance for forage and rations, depends upon the question of fact, whether these constitute a part of the pay of a colonel in the army of the United States. If they are allowed for the purpose of defraying his necessary expenses, and are not intended as a part compensation for his services, then is the act free from constitutional objections.  These conclusions seem so necessarily to flow from what has been said on another branch of this case, that illustration would be superfluous.

A question of the gravest moment is yet to be examined.  It is this, is the act of the 31st of December, 1823, an enactment within the legitimate sphere of legislative competency?  This is confessedly a question of great delicacy, and I trust I approach it with a becoming sense of its importance; it brings into view, to some extent, the powers of the respective departments of government, and is well calculated to excite the jealousy of that branch which is charged with having transcended its constitutional limits.  While I am fully impressed with these sentiments, I should be reckless of the station I occupy, and forgetful of my obligations to my country, did I not freely and candidly consider the question, and declare the conviction of my judgment thereupon.

The right of the judiciary, to scan legislative acts, with the view to ascertain if they are repugnant to constitu-

53

tional inhibition, at' this period of our judicial history, would seem to be unquestionable. As however the plaintiff's counsel has cited authority, shewing the amplitude of the power of the judiciary for this purpose, and as I am unapprised that there are some of respectable intelligence, who have not scrupled to maintain the omnipotence of the legislature, in the scale of political existence, I deem it proper very briefly to declare my opinion upon this very interesting topic. And I cannot do this in terms more felicitous, than by borrowing the language of Mr Justice Patterson. That learned judge, speaking upon the subject, observes, "it (a constitution) is the form of government, delineated by the mighty hand of the people, in which certain first principles of fundamental law are established. The constitution is certain and fixed; it contains the permanent will of the people, and is the supreme law of the land; it is paramount to the law of the legislature, and can be revoked or altered only by the authority that made it." Again, "I take it to be a clear position, that if a legislative act oppugns a constitutional principle, the former must give way, and be rejected on the score of repugnance. I hold it to be a position equally clear and sound, that in such case, it will be the duty of the Court to adhere to the constitution, and to declare the act null and void. The constitution is the basis of legislative authority; it lies at the foundation of all law, and is a rule and commission by which both legislators and judges are to proceed. It is an important principle, which in the discussion of questions of the present kind, ought never to be lost sight of, that the judiciary in this country is not a subordinate but a co-ordinate branch of the government." The reasoning is so entirely satisfactory to my mind, that I will not attempt to illustrate the point by further argument, but will content myself with a reference to the leading adjudications, in which the power of the judiciary has been assumed and acted upon. 2 Dallas' Reports, 304, 410, 414; 3 Dallas' Reports, 266; Ibid, 386, 401; 1 Cranch's Reports, 174; 6 Ibid, 125; 7 Ibid, 164; 9 Ibid, 43; 4 Wheaton Reports, 122; Ibid, 209; 8 Wheaton Reports, 1; Adams' New Hampshire Reports, 99; 15 Massachusetts Reports, 447; 16 Johnson's Reports, 233; 3 Connecticut Reports, 253; 2 Southern Reports, 466; Hardin's Reports, 5; 3 Marshall's Reports 73; 2 Littell's Reports, 90; Cooke's Reports, 217; 3 Desaussure's Reports, 476; 1 Haywood's Reports, 28; 2 Haywood's Reports,

310, 374; 1 Carolina Law Reports, 244; and 1 Murphy's JANUARY 1831
Reports, 58; 4 Wheaton's Reports, 518; 2 Peters' Reports, 522.

Dale
v.
The Governor.

The powers of the State government are divided into three distinct departments, and each of them confided to a separate body of magistracy; those which are legislative to one; those which are executive to another; and those which are judicial to a third.    And each of these departments is inhibited the exercise of powers which properly belong to either of the others, except in the instances excepted by the constitution.[a]    It appropriately appertains to the legislature to enact laws; to the judiciary to expound and administer them; and to the executive, so far as its duties require, to superintend their execution; and when either of the departments transcends the limits which duty prescribes, it is justly chargeable with trespassing on territory, which has been constitutionally vested in one of the other branches of government.    In the apportionment of power, the framers of the constitution very wisely intended that each branch of the government should be a check upon the others, and all be made to move within their legitimate orbits, that private rights, internal quiet, and the permanence of our institutions might be the better secured.    If the power of adjusting private rights were to be conceded to the legislature, uncontrolled by judicial action, the tenure by which we hold our property would be precarious indeed, and our government would be wanting in every essential, to secure the affections of the people.    The line is so well drawn between the powers of the different branches of government, that a difficulty will rarely occur in determining which branch should act upon any particular question.    Without attempting to shew what specific duties belong to the legislature, I would assign to the judiciary, the exclusive right to enforce and annul contracts, whether entered into between sovereign States, a State and an individual, or individuals.

[a] Con. Ala. art. ii. sec. 1 and 2.

In the great case of the *Dartmouth College v. Woodward,* the Supreme Court were called upon to examine into the validity of several acts of the legislature of New Hampshire, imparing the corporate privileges of the trustees of the Dartmouth College, which had been conferred by charter from the British crown, in 1769.    The general powers of the legislature were discussed at the bar, and the very learned counsel who argued for the plaintiff in error, employed this language:  "It is not too much to

assert that the legislature of New Hampshire would not have been competent to pass the acts in question, and to make them binding on the plaintiffs without their assent, even if there had been in the constitution of New Hampshire, or of the United States, no special restriction on their power, because these acts are not the exercise of a power properly legislative. Their object and effect is to take away from one, rights, property and franchises, and to grant them to another. This is not the exercise of a legislative power. To justify the taking away of vested rights, there must be a forfeiture; to adjudge upon and declare which, is the proper province of the judiciary." In the constitution of New Hampshire, there is no express negation of power in the legislature to decide upon a judicial question, but the argument is founded upon the inherent powers of the legislative and judicial departments. The Court expressed no opinion upon this argument, but reversed the judgment upon another ground. The learned counsel cites, in support of his argument, *Calder and wife v. Bull and wife,*[a] In that case, the consideration of the question as to the extent of the legislative power, apart from express constitutional restrictions, did not come directly before the Court; and though the opinions of the judges contain *dicta* upon the question, it seems difficult to conjecture what would have been their opinions as to the right of the legislature to adjudge upon a judicial question. I am not however prepared to discard this argument as unsound, yet as the occasion does not require it, I decline expressing an opinion upon the principle it endeavors to maintain.

I have shewn that the second section of the second article of the constitution, inhibits the action of the legislature upon judicial questions. I have asserted that the right to annul a contract is a question of that character, and have endeavored to shew that the act of December, 1821, was a contract, so far as it proposed to compensate the plaintiff, for his services and losses. If these positions are maintainable, the conclusion necessarily follows, that the repealing act of December, 1823, is repugnant to the constitution, and cannot prevail.

In *Durham v. Lewiston,*[b] the Supreme Court of Maine decided that the legislature of that State had no authority by the constitution, to grant a review of a suit between private citizens. The notice which I have seen of this case is so very brief, that I cannot ascertain the rea-

*Margin notes:*

Dale
v.
The Governor.

*a* 3 Dal. R. 380.

*b* 4 Greenleaf 140.

soning employed by the Court; but do not doubt that the
Court denied to the legislature the power to grant a new
trial, on the ground that the power involved a judicial in-
quiry; in as much as the constitution of Maine contains a
provision similar to that of our own constitution, distribu-
ting the powers of government amongst its different de-
partments, and inhibiting an interference in its exercise,
by each, with the others.[a]    To the same point is *Merrill*
*v. Sherburne.*[b]

JANUARY 1831

Dale
v.
The Govern-
or.

a Con. Maine
art. iii. sec.
1 and 2.
b Adams' N.
H. Rep. 199.

As this branch of the case was but briefly touched in
argument, I perhaps have given to it too extended an ex-
amination.    The conclusions however which I have ex-
pressed, are the convictions of my judgment, formed upon
much reflection.    I now proceed to consider further the
act of December, 1823, with a view to ascertain its com-
patibility with other provisions of the constitution.    By
the nineteenth section of the declaration of rights,[c] it is
declared, that "no *ex post facto* law, nor law impairing
the obligation of contracts, shall be made."    The tenth
section of the first article of the constitution of the United
States, restrains the States from passing any "*ex post facto*
laws, or laws impairing the obligation of contracts.*"*
These provisions are restrictions upon the legislature, and
are designed as a protection of the absolute and relative
rights of the citizen, against the aggression of the law-
making power; and their wisdom is well attested by in-
stances, which the history of our own government fur-
nishes.    By *ex post facto* laws, we are to understand
those which operate retrospectively, so as to make acts
committed previous to their enactment, though at the time
of their commission, they were indifferent in themselves,
objects of punishment.[d]    Other instances of *ex post facto*
laws might be cited, but as they relate exclusively to
crimes, it will be useless to consider them here; we there-
fore proceed to examine the latter members of these provi-
sions.    Any law which diminishes the legal efficacy of a
contract, doubtless impairs its obligation; much more does
a law which disavows it entirely, and absolves the con-
tracting party from a compliance.    It is immaterial who
are the contracting parties, or what the subject of contract,
the constitutional provision, both of Alabama and the
United States, is general in its application, embracing as
well the contracts of individuals, as those entered into
between a sovereign State, and an individual.    The ques-
tion as to the right of the legislature to impair the obliga-

c Con. Ala.

d Calder and
wife v. Bull
and wife, 3
Dal. R. 386.

JANUARY 1831 tion of contracts, was largely considered in the case of *Fletcher v. Peck.[a]* The legislature of Georgia, in 1795, passed an act authorizing the Governor of that State to convey to certain individuals, (particularly named,) on the payment of a certain sum, an extensive tract of unappropriated lands, situated within its territorial limits; the conditions prescribed by the act were complied with, and the individuals named therein, received a conveyance. The legislature of that State, holden in 1796, repealed the law of the preceding year, upon the assumption among other causes assigned, that its passage was induced by the bribery of some of the members of the legislature, who assented to it. The validity of the repealing law came directly under examination. Chief Justice Marshall, who pronounced the opinion of the Court, very satisfactorily shews that the act of 1796 is invalid, because of its repugnance to the tenth section of the first article of the constitution of the United States. "A contract, (says he,) is a compact between two or more parties, and is either executory or executed. An executory contract, is one in which a party binds himself to do, or not to do, a particular thing; such was the law under which the conveyance was made by the government. A contract executed is one in which the object of the contract is performed; and this, says Blackstone, differs in nothing, from a grant. A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right. If under a fair construction of the constitution, grants are comprehended under the term contracts, is a grant from the State excluded from the operation of the provision? Is the clause to be considered as inhibiting the State from impairing the obligation of contracts between two individuals, but as excluding from that inhibition contracts made with itself? The words themselves contain no such distinctions. They are general and are applicable to contracts of every description." Again, says the Chief Justice, "the legislature of Georgia was a party to this transaction; and for a party to pronounce its own deed invalid, whatever cause may be assigned for its invalidity, must be considered as a mere act of power, which must find its vindication in a train of reasoning not often heard in courts of justice."

A contract is defined in the English law, to be an agree-

ment upon sufficient consideration to do, or not to do, a
particular thing.   The act of December, 1821, is obvi-
ously embraced by this definition; it contains an agree-
ment to pay to the plaintiff, the half pay for life, of a co-
lonel in the army of the United States, upon consideration
of services rendered and losses sustained, by him in the
defence of the country, against a public enemy.   By the
passage of the act, the plaintiff acquired a right to the pro-
vision which it made for him; and any law which absolves
the State from a compliance with its agreement, is sustain-
able only upon the hypothesis, that it is competent for the
legislature to divest individual rights, and impair the obli-
gation of contracts.

JANUARY 1831<br>Dale<br>v.<br>The Govern-<br>or.

The case of the *State of New Jersey v. Wilson*,[a] next
brought before the Supreme Court, the tenth section of
the first article of the constitution of the United States for
examination.  In that case, the colonial legislature of New
Jersey, in 1758, authorized the purchase of lands for the
Delaware Indians, and stipulated that the lands to be pur-
chased should not be subject to any tax.   The lands were
purchased and conveyed to trustees, for the use of the In-
dians; in consideration of which, the Indians released
their claims to other lands.   These lands were occupied
by the Indians until 1803, when they were purchased by
individuals under the authority of an act of the legislature,
and in the succeeding year, the act of 1758, was repealed.
The Court held, that the act of 1758, was a contract, and
that the act of 1804, was a breach thereof, and consequent-
ly inhibited by the constitution.

a  7  Cranch<br>R. 164.

In the case of *Terrett v. Taylor*,[b] the Supreme Court
were again required to go into the consideration of this
very interesting topic of constitutional law.   It was there
ruled, that a legislative grant, not forbidden by the consti-
tution, vested an indefeasible title; and the doctrine that
such a grant was only *durante bene placeto*, was not sup-
portable either upon authority or principle.   Such a doc-
trine was repugnant to the letter and spirit of the consti-
tution, and adverse to the principles of natural justice.

b 9 Cranch R.<br>43.

But the most elaborate discussion of the right of the
legislature to modify or abrogate contracts, was reserved
for the great case of the *Dartmouth College v. Wood-
ward*.   It was there held, that the charter granted by the
British crown, to the trustees of Dartmouth College, in
1769, was a contract in the meaning of the constitution,
and protected by it; that the College was a private chari-

JANUARY 1831 table institution, not liable to legislative control; and that the alteration of the charter, in a material respect, without the consent of the corporation, was an act imparing the obligation of the charter, and therefore void. The Chief Justice, in the opinion which he pronounced, observed that the provision in the constitution had only been understood to embrace contracts in regard to property, or objects of value, and which confer rights that may be asserted in a Court of justice. Mr Justice Story, in his opinion, speaking of the nature of contracts which the constitution designed to protect, denied the right of the legislature to dissolve any legitimate contract, even that of marriage, without a breach by either party, against their consent.

This doctrine came again under discussion, in the case of *Green v. Biddle*.[a]   In that case, it was decided by the Court, that the unconstitutionality of a law, did not depend upon the extent to which it proposed to modify a contract. That to postpone or accelerate the period of its performance, to impose conditions not expressed, or to dispense with those expressed, however unimportant in their effect, impairs its obligation.   I might cite other decisions both of the State and Federal Courts, reiterating these principles, but those already quoted, serve to shew the liberality of the supreme national tribunal, in the protection of private rights.   I have purposely omitted to notice the decisions of the State Courts upon this question, believing that the decisions of the Supreme Court of the United States, should be considered as of higher authority, in as much as that Court would have the ultimate jurisdiction, if our judgment should be adverse to the inhibtion of the federal constitution.[b]

The deductions inferable from authority on this subject, are these:   1st. That vested rights cannot be taken away by an act of legislation.   2d. Any law which annuls or modifies a contract, whether executed or executory, impairs its obligation within the meaning of the constitution. 3d. Legislative grants are themselves contracts, and as well as every other description of contracts made by the legislature, or under its authority, cannot be impaired by law.   4th. Every law that alters a contract, however immaterial the alteration may be, impairs its obligation, and is consequently void.   5th. The constitution protects grants made, or contracts entered into before its adoption, as well as those made, or entered into subsequently,

*Dale v. The Governor.*

*a* 8 Wheat. R. 1.

*a* Con. U. S. art. iii, sec. 2

where they are consistent with the provisions of that instrument.

I do not intend in any thing I may have said, to convey the idea that legislative grants, are made with such solemnity and deliberation, that they can never be annulled. I only insist that they cannot be avoided at the mere violation of the grantor. If they are made upon a sufficient consideration, I cannot conceive of a reason, why they should be relieved from the operation of those rules which control individual contracts. I will not say but the State might be relieved from the obligation of the grant, by making it appear that the legislature were influenced in the passage of the act, by false suggestions; but I will say that the grant must be operative, unless its invalidity can be shewn by extrinsic proof. To suppose the grant to be a gratuitous act, would be to discard the acknowledgment of a consideration, by the legislature, in the absence of all contradictory proof, which a respect for precedent, and a solicitude to preserve harmony in judicial decisions, prevent me from doing. In the conclusions to which I have attained, I believe myself sustained, both by principle and authority. Could I have entertained a doubt that the repealing act was not unconstitutional, a respect for the body that enacted it, would have constrained me to maintain its validity.

Hitherto I have examined the case upon its merits; it now remains to consider several objections which were raised by the defendant's counsel, not affecting the plaintiff's right to recover, when abstractly considered. It is first objected, that the finding of the jury does not discover an unappropriated balance in the treasury. If an execution was the regular method by which satisfaction of a judgment recovered against the State, is procured, the objection would not be free from difficulty; for the act directs that the plaintiff shall be paid from any money in the treasury not otherwise appropriated; and it would follow that if there were no unappropriated money in the treasury, he could not insist upon payment. But the satisfaction of a judgment against the State, is never coerced by execution. The object of an action against the State, can only be to ascertain whether there is a right; the satisfaction of that right is to be provided for by the legislature. It is however apprehended, that this objection is predicated upon a mistake in point of fact; for the finding of the jury explicitly states a refusal of the treasurer to pay to the

JANUARY 1831

Dale
v.
The Govern-
or.

plaintiff, the sum due him under the act of 1821. They do not it is true, find the cause of that refusal to have been a want of money in the treasury. If the refusal was dictated by any cause which affects the plaintiff's right to recover, the jury should have found the fact. In the absence of such finding, were it necessary to assign a cause, it would be quite as reasonable to attribute the refusal to the supposed influence of the acts of January and December, 1823.

In the second place, it is objected that the plaintiff cannot have judgment, because he has not brought his action against the proper party, nor in the proper manner. The writ, it is obvious, is not framed conformably to the directions of the act of the 6th January, 1827, "directing in what manner and in what Courts suits may be brought against the State of Alabama." It is in form, a writ of *capias ad respondendum;* the indorsement states the cause of action to be the non-payment of the sum of money due the plaintiff, by the appropriation made by the act of 1821. The second section of the statute of the 6th January, 1827, directs that suit shall be instituted against the State, by the suing out of the office of the clerk of the Circuit Court, in which the suit shall be brought, a summons, &c., returnable, &c., which shall be served by the sheriff on the Governor, and be deemed the leading process in the cause, and have the same effect and incidents as writs, &c. The provision requires that a summons shall be the first process in a cause against the State. The declaration, in charging the State as a party, supposes that the Governor has been summoned, and sets forth a cause of action against the State, and is free from objection. The object of the summons is to give notice of the commencement of the action, and if an objection had been taken at the proper time, that the action was improperly brought, I will not say that it should not have been sustained; but it is certainly too late, after the defendant is admitted to be in Court, and issue made up and tried, to listen to the objection, that the defendant was not properly brought in; an appearance of record dispenses with process.

The verdict is not perhaps drawn with so much accuracy, as a greater regard for technicality would have dictated; and my first reflections induced a doubt, whether the Court below should not have declined rendering any judgment upon it, but have awarded a *venire facias de novo.*[a]  I do

*a* 1 Saund.
154-.5.

not doubt but the facts found, authorized a verdict for the plaintiff; but I believe that the conclusion of the verdict, which referred these facts to the Court, placed the question to be determined by the Court, upon the liability of John Murphy, as Governor of the State, and not upon the liability of the State. Examination into authority, however, shews that it is not only competent, but proper, for the Court to interpret the meaning of the jury, if their verdict be susceptible of interpretation, rather than refer the issue to another jury.[a] Now it is most clear, that the jury intended to bring before the Court, the question of law, whether the act of 1821, was repealed by acts of January and December, 1823; and if the Court should believe that the first act was still in force, then to find in favor of the plaintiff. That was the point to which their inquiries were mainly directed by the evidence; and this was the question of law, which they desired the Court to adjust. In every point of view, in which this case has presented itself to my mind, I am of opinion that the judgment of the Circuit Court should be reversed, and judgment rendered for the plaintiff.

In this opinion JUDGE CRENSHAW concurs.

Judgment affirmed.

*JANUARY 1831*

Dale
v.
The Governor.

[a] Porter v. Rammery 10 Mass. R. 66. Jenks et al. v. Hallet et al. Caines' R. R. 60.