## Carozzoni v. Thomas

*Jerome L. Cohen*, for plaintiff.

*Shea & Shea*, for defendants.

PINOLA, P. J., November 16, 1966.—Plaintiff seeks to compel defendants to reinstate him upon the rolls of the Anthracite Health and Welfare Fund of the United Mine Workers as a beneficiary.

STATEMENT OF PLEADINGS AND ISSUE RAISED

The pleadings consist of the complaint, an answer with counterclaim and a reply to the counterclaim.

The issue involved is whether plaintiff, who was taken from the rolls of the Anthracite Health and Welfare Fund, should be reinstated.

From the evidence, we make the following

FINDINGS OF FACT

1. The Anthracite Health and Welfare Fund is a trust created by a written labor contract dated June 7, 1946, between the United Mine Workers, Districts 1, 7 and 9, as the collective bargaining agent for the Anthracite Mine Workers, and the Anthracite Operators as employers; which agreement from time to time has been amended, including the Amendment of February 1, 1959, and the supplements thereto.

2. The pertinent terms of the trust are as follows:

"The Fund heretofore created shall be held in trust irrevocably and shall endure as long as the purposes for its creation shall exist. Said purposes shall be to pay . . . benefits to employees of said operators, their families and dependents, for medical or hospital care, pensions on retirement or death . . . benefits for any and all other purposes which may be specified, provided for or permitted in Section 302(c) of the 'Labor-Management Relations Act, 1947' and the amendments thereto, as agreed upon from time to time by the trustees, including the making of any or all of the foregoing benefits applicable to the individual members of the United Mine Workers of America and their families and dependents, and to employees of the operators other than those exempted from this Agreement; . . . and subject to the stated purposes of the Fund and the applicable provisions of the 'Labor-Management Act of 1947' as amended, and other applicable law, the Trustees shall have full authority with respect to questions of coverage, eligibility, priorities among classes of benefits, amounts of benefits, methods of providing or arranging for

provisions of benefits, investment of Trust funds, and all other related matters".

3. Defendants, Emmett L. Thomas, John D. Jillson and Mart F. Brennan, are presently the duly constituted trustees of the Anthracite Health and Welfare Fund, said John D. Jillson having succeeded Harry J. Connolly as trustee on September 1, 1964.

4. By resolution dated July 23, 1948, and duly amended thereafter, trustees set up and designated a separate fund, known as the Anthracite Pension and Retirement Fund, for the purpose of providing pensions or annuities.

5. Trustees, by resolution dated January 15, 1954, with respect to service, provided:

"(b) The applicant must have been employed in the Anthracite Industry on or after June 1, 1946. The Anthracite Industry is hereby defined as those operators, producers or processors of anthracite coal, who are party-signatory to the agreement creating the Fund, or its supplements, or who contribute to the Fund. . . ."

And with respect to retirement, trustees by said resolution provided:

"Retirement from service shall be when the member of the United Mine Workers of America permanently ceases to work in the anthracite coal industry".

6. Trustees, by resolution dated August 23, 1957, further provided:

"Resolved, by the Trustees of the Anthracite Health and Welfare Fund, that any pensioner returning to the anthracite industry shall not be entitled to receive the pension thereafter, even though he subsequently retires".

7. Plaintiff worked in the mines for 43 years, from 1910 through 1953, as a laborer and then as a miner.

8. Plaintiff retired from the mines in 1953, and was paid a pension from defendant, Anthracite Health and

Welfare Fund, of $100 per month. The sum was later reduced to $50 and still later to $30 per month.

9. On April 16, 1964, plaintiff went to work for Newport Excavating Company as a watchman in a garage and office yard, receiving the pay of a laborer. He was employed from that date through the first half of September, 1964, when he was laid òff.

10. Plaintiff worked five days a week, from 7 A. M. to 2:30 P. M., including Sundays, when no trucks were moving or being repaired.

11. Newport Excavating Company is engaged in the production and sale of anthracite coal and is a signatory to the Anthracite Wage Agreement of February 1, 1959, and its supplements, and is engaged in the anthracite industry.

12. The trucks which were housed in the garage were used in hauling coal produced at a stripping operation some distance away. They went out empty and returned empty in the afternoon.

13. Plaintiff, at the time he worked as a watchman, was not physically able to work inside the mines because of his health.

14. Plaintiff has at all times been a member of the United Mine Workers and has paid the required dues.

15. Plaintiff was never informed or told by union officials that if he went to work as a watchman, he would lose his pension.

16. In order that he qualify for death benefits, it was necessary for plaintiff to remain in the union, and, consequently, he transferred from one local to another.

17. While on the company's payrolls he was listed as a laborer. Actually, plaintiff was a watchman.

### DISCUSSION

Plaintiff contends that it is the nature of his work which governs whether he returned to work in the

anthracite industry, and not the general business of his employer.

Trustees, on the other hand, insist that when plaintiff returned to work as a watchman of the garage and office yard, he returned to work in the anthracite industry and thereafter was disqualified from receiving a pension on a subsequent retirement.

In Liggett's Petition, 291 Pa. 109, the court said, page 115:

"Webster's International Dictionary defines 'industry' as 'Any department or branch of . . . business; especially one which employs much labor and capital and is a distinct branch of trade.' This definition is consistent with that given in other modern dictionaries".

The anthracite industry is defined in the contract and is found, supra, in finding no. 5. There is no doubt that plaintiff returned to work in the anthracite industry. The question, as we see it, is whether by so doing he lost his pension rights.

In Forrish v. Kennedy, 377 Pa. 370, this very contract was involved. In spite of the fact that trustees were given "full authority", the court held that these words were not synonymous with the terms "absolute discretion" or "unlimited discretion". Then Justice Chidsey, quoting from Brown's Appeal, 345 Pa. 373, declared, at page 379:

"While a court cannot control the discretion conferred upon a trustee it may compel him to exercise it in good faith and within the bounds of a reasonable judgment, and it may also interpose where he fails to use his judgment at all because of a mistaken view, either of fact or law, as to the extent of his power or duties".

Did trustees have the power to curtail plaintiff's pension rights by the adoption of the resolution of August, 1957?

This plaintiff had been granted his pension in 1954, and payments had been made to him for nearly 10 years.

When payment was made in 1954, his rights to a pension became vested, and the pension could not be denied or interfered with by subsequent amendments or regulations concerning same.

Dealing with pension and death benefits, in Pennie v. Reis, 132 U. S. 464, 10 S. Ct. 149, 33 U. S. L. Ed. 426, Justice Field declared, page 471:

"It requires no argument or citation of authorities to show, that in making a disposition of a fund of that character, previous to the happening of one of the events mentioned, the State impaired no absolute right of property in the police officer. The direction of the State, that the fund should be one for the benefit of the police officer or his representative, under certain conditions, was subject to change or revocation at any time, at the will of the legislature. There was no contract on the part of the State that its disposition should always continue as originally provided. Until the particular event should happen upon which the money or a part of it was to be paid, there was no vested right in the officer to such payment. His interest in the fund was, until then, a mere expectancy created by the law, and liable to be revoked or destroyed by the same authority".

In Carey v. Retirement Board of San Francisco, 131 Cal. App. 2d 739, 281 P. 2d 25, the court said, at page 30:

"(W)hile there is a continuing right to a pension, Dryden v. Board of Pension Com'rs, 6 Cal. 2d 575, 581, 59 P. 2d 104, a pensioner does not have a right to a specific sum, hence the amount may be reasonably increased or decreased, Carr v. Fire Comission, 30 Cal. App. 2d 208, 85 P. 2d 959. Any time before the contingency happens upon which a right to a pension

vests, the law granting such right is subject to alteration or repeal. Jordan v. Retirement Board, 35 Cal. App. 2d 653, 657, 96 P. 2d 973".

In Jordan v. Retirement Board, supra, the court held, page 976:

"It is well established, however, that pension rights do not vest at the time of the enactment of the law, but only upon the happening of the contingency or event upon which the right thereto accrues . . . , and that at any time before the happening of the contingency upon which the right to the pension vests the law granting such right is subject to alteration or repeal. . . . Here Jordan's right to a pension vested in him in 1914 at the time of his injuries and retirement, and having vested in him at that time his right thereto could not have been subsequently taken away".

In Moran v. Firemen's and Policemen's Pension Fund Commission, 20 N. J. Misc. 479, 28 A. 2d 885 (1942), plaintiff was a former Lieutenant of Police of Jersey City who had received a pension from May, 1938, to June 1, 1940. On August 10, 1942, the commission adopted two regulations. The one required the appearance of the pensioner in person to be identified, and the other declared that no payments would be made during the war unless the recipient was a resident of the United States. Plaintiff had gone to Ireland, and from there he had submitted his photograph. The court allowed recovery, saying:

"If the right to a pension instalment has matured the same may not be denied or interfered with by subsequent amendments or regulations concerning the payment; 112 A. L. R. 1011. It clearly appears in the case under consideration that the claim of the plaintiff is based on a vested right; that while the regulations adopted by the defendant on August 10, 1942, may or may not affect pension payments that become due after that date such regulations do not affect the

vested right of the plaintiff which matured long before that date. As to whether the regulations adopted on the date last mentioned may or may not be reasonable does not affect, in either case, the vested right of the plaintiff".

Other cases involving public servants and reaching the same conclusion are Dale v. The Governor, 3 Stew. 387 (Ala.) ; and Kavanagh v. Board of Police Pension Fund Com'rs., 134 Cal. 50, 66 Pac. 36.

The law is the same in connection with private pension plans. In McNevin v. Solvay Process Co., 53 N. Y. Supp. 98, 32 App. Div. 610, a discharged employe was held to have no right to part of the pension fund credited to him because trustees had determined he was not entitled to payment thereof. The court declared, page 99:

"It is conceded that this pension fund has been created voluntarily, and is a gift by the defendant, and the question upon which this case turns is whether, when a sum is credited to an employe on the pass book furnished by the defendant, the employe has a vested right in the sum so credited, or whether, under the terms by which the fund is established, the employe acquires *no vested right until the gift is completed by actual payment* to the employe. It must be conceded at the outset that a person or a corporation proposing to give a sum for the benefit of any person or any set of persons has the right to fix the terms of his bounty, and provide under what circumstances the gift shall become vested and absolute. Under the regulations established, it seems to me that none of the employes have a vested interest in any part of this fund, even though credited upon their pass books, until the gift is completed by actual payment". (Italics supplied).

From the findings of fact, we reach the following

CONCLUSIONS OF LAW

1. Plaintiff, in going to work for the Newport Ex-

cavating Company, returned to work in the anthracite industry.

2. The rights of plaintiff to a pension vested through the payment in 1954 and for nearly three years thereafter.

3. Trustees, in adopting the resolution of August 23, 1957, could not affect those rights.

4. Defendants are not entitled to recover on their counterclaim.

Accordingly, we enter the following

DECREE NISI

It is ordered, adjudged and decreed as follows:

1. The counterclaim is dismissed.

2. The complaint is sustained, and defendants shall reinstate plaintiff on the pension rolls of the Anthracite Health and Welfare Fund and pay the pension to him from the date of suspension to this date and continuing thereafter.

3. Defendants are to pay the costs.